IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 03-cv-01959-MSK-PAC

AHMED M. AJAJ,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
ROBERT A. HOOD,
JAMES BURRELL,
DAVID DUNCAN,
C. CHESTER,
J.C. ZUERCHER,
RON WILEY, in his official capacity, and
MICHAEL NALLEY, in his official capacity,

      Defendants.

---

## ORDER GRANTING QUALIFIED IMMUNITY
## AND DISMISSING CLAIMS

---

THIS MATTER comes before the Court on a Motion for Summary Judgment **(#229)** filed

by Defendants Robert A. Hood, James Burrell, David Duncan, C. Chester and J.C. Zuercher,[1]

limited to the issue of qualified immunity.  The Plaintiff, Ahmed M. Ajaj, filed a response **(#239)**

in opposition, and the Federal Officers filed a reply **(#245)**.  Having considered the same, the

Court finds and concludes as follows.

### I.  Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1] To the extent practicable, the Court refers to each party by name.  When the matter concerns Mr.
Hood, Mr. Burrell, Mr. Duncan, Mr. Chester, and Mr. Zuercher, the Court uses the collective term
"Federal Officers."

## II.  Procedural Background

The Plaintiff, Ahmed Ajaj, is a federal prisoner who is incarcerated at the United States Penitentiary Administrative Maximum Unit ("ADX") in Florence, Colorado.  He commenced this action *pro se* on September 22, 2003, but has been represented by counsel for more than two years since September 29, 2004.

Prior to being represented by counsel, Mr. Ajaj filed two Complaints **(#3, #4).**  Several Defendants moved to dismiss his claims **(#38, #39, #46, #47, #61, #81, #83, #84),** and at their request **(#54)**, the Magistrate Judge stayed discovery pending a ruling on the motions.  The Plaintiff then retained counsel.  As a consequence, the Court denied **(#103)** the motions to dismiss because Mr. Ajaj intended to file a Second Amended Complaint with the benefit of counsel.

Through his counsel, Mr. Ajaj filed a Second Amended Complaint **(#109)** in December 2004.  All Defendants filed motions to dismiss **(#122, #123)** Mr. Ajaj's claims.[2]  On September 27, 2005, the Court denied **(#158)** the motions to dismiss, stating:

> The failure of the Second Amended Complaint to identify the facts applicable to each purported claim for relief has resulted in disjointed and ill focused briefing with regard to the pending motions to dismiss. In their motions, the Defendants guess as to the factual basis of each claim, sometimes incorrectly. The Plaintiff's responses suggest particular facts to support some claims, but offer no clarification as to others. The little clarification offered in Plaintiff's responses has resulted in new arguments for dismissal being raised by the Defendants in their replies. To these new arguments, the Plaintiff has not had the opportunity to respond.

Due to the lack of clarity in the Second Amended Complaint, the Court directed Mr. Ajaj to file a

---

[2] The Defendants also moved to stay discovery **(#124)** pending a ruling on these motions to dismiss, and the Magistrate Judge granted such stay effective February 1, 2005 **(#126)**.

Third Amended Complaint, which he filed on November 16, 2005 (**#187**).[3]

All Defendants moved to dismiss (**#162, #163**) the Third Amended Complaint.  On May 11, 2006, the Court granted, in part, the motions (**#186**), leaving the following claims:[4]

Claim 1:    The United States negligently failed to house Mr. Ajaj in a low altitude, smoke-free environment contrary to medical instructions.

Claim 2:    Mr. Hood, Mr. Burrell and Mr. Duncan failed to protect Mr. Ajaj from an unreasonable risk of harm by failing to move him to a low altitude, smoke-free housing assignment, in violation of the Eighth Amendment and contrary to his prescribed treatment.

Claim 3:[5]   (A) Mr. Hood, Mr. Burrell, Mr. Chester and Mr. Duncan were deliberately indifferent to the conditions of Mr. Ajaj's confinement in violation of the Eighth Amendment, in specific: (1) limitations on his property rights, mail, access to telephones and recreation; (2) lock-down for 23 to 24 hours per day, in extreme isolation; (3) imposition of discipline for minor offenses; (4) noise; (5) lights which remain on in his cell 24 hours per day; and (6) the indefinite nature of his confinement at ADX.

(B) Mr. Hood[6] violated Mr. Ajaj's right to procedural due process because Mr. Ajaj was transfered to ADX without notice or a hearing, and because he continues to be confined there without a hearing.  He claims a deprivation of a liberty interest, because the conditions of confinement at ADX are, in his view, significant and atypical.

---

[3] Mr. Ajaj initially filed his Third Amended Complaint on October 17, 2005 (**#160**) but later filed a corrected version.

[4] Mr. Ajaj's claim against the United States is asserted under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.* He asserts constitutional tort claims against Mr. Hood, Mr. Burrell, Mr. Duncan, Mr. Chester and Mr. Zuercher in their individual capacities under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).  Mr. Ajaj has also named Ron Wiley and Michael Nalley as Defendants in their official capacities, for purposes of enforcing any award of injunctive relief.  There are no allegations that either Mr. Wiley or Mr. Nalley engaged in any conduct which violated Mr. Ajaj's rights.

[5] Claim 3 is comprised of two subclaims, which the Court denominates as Claims 3(A) and 3(B).

[6] Although Mr. Ajaj also asserted this claim against Mr. Burrell, Mr. Chester and Mr. Duncan, Mr. Ajaj agrees that he cannot prove a due process violation by any of them.  Therefore, the Court deems Claim 3(B) to be asserted solely against Mr. Hood.

Claim 5:      Mr. Hood, Mr. Chester and Mr. Zuercher[7] violated Mr. Ajaj's right to
              equal protection, in that Mr. Ajaj has been singled out for different and
              harsher treatment because he is a Palestinian Muslim and not allowed to
              participate in the "step-down" program.

Mr. Ajaj seeks both compensatory and injunctive relief.

Trial was set to commence on July 11, 2006.  On May 10, 2006, the parties jointly moved

(**#185**) to vacate and reset the trial because they believed that the stay of discovery – which had

been lifted by operation of the September 27, 2005 Order – was still in place, and they had

conducted none.  The Court denied (**#189**) their motion.  Upon the parties' motion (**#190**) for

reconsideration, the Court held a hearing on May 22, 2006 (**#195**), granted the motion for

reconsideration, vacated the trial setting, and set deadlines for discovery and for the submission of

a proposed final pretrial order.  Upon a motion (**#222**) by the Federal Officers, the Court granted

them leave to file a motion for summary judgment limited to the issue of qualified immunity.  That

motion is now before the Court.

## III.  Issue Presented

The issue presented by the Federal Officers' summary judgment motion is whether they

are entitled to qualified immunity with regard to Mr. Ajaj's request for compensatory relief on his

*Bivens* claims, which are Claims 2, 3(A), 3(B) and 5.

## IV.  Material Facts

Based upon the evidence submitted, which the Court construes most favorably to the

Plaintiff, Ahmad Ajaj, the Court finds the following facts for purposes of this motion.

---

[7] This claim was originally asserted against all five Federal Officers.  Now, Mr. Ajaj agrees that he
can establish no equal protection violation by Mr. Burrell and Mr. Duncan.  Therefore, the Court deems
Claim 5 to be asserted solely against Mr. Hood, Mr. Chester and Mr. Zuercher.

At times pertinent to this action, Robert Hood was the warden at the United States Penitentiary, Administrative Maximum Unit ("ADX") in Florence, Colorado.  James Burrell, David Duncan, Claude Chester and Jerome Zuercher were associate wardens at ADX.

Mr. Ajaj, a Palestinian Muslim, was convicted in the 1993 bombing of the World Trade Center.  Up until September 4, 2002, he was housed at FCI Edgefield. On September 11, 2001, Mr. Ajaj was placed in administrative detention at FCI Edgefield, without any prior notice or hearing.  There are no facts in the record as to the conditions of administrative detention at FCI Edgefield.

On September 4, 2002, Mr. Ajaj was transferred to ADX and placed in administrative detention.  He was given no notice or a hearing before the transfer or with regard to his assignment to administrative detention.

On March 28, 2002, the United States Department of Justice issued a memorandum to "all regional directors" regarding the handling of "Pre-September 11th Terrorist Inmates."  Portions of this memorandum are redacted; the unredacted language states: "Following the terrorist events of September 11, 2002, inmates with *possible* knowledge of terrorist events or ties were placed in Administrative Detention until their cases could be thoroughly reviewed.  Twenty-four of these inmates remain in Administrative Detention as of this date."  The memorandum also states that certain inmates "are appropriate for transfer to [ADX], and in fact, most have already been referred for such transfer."  It directs the regional directors to review a list of inmate names to determine whether they concur with the placement of such inmates at ADX.  Mr. Ajaj is named in this list as an inmate recommended for transfer to ADX.  The notes next to his name read: "Palestinian; expert terrorist arrived from Pakistan to advise cells.  Believed to be a former

member of *al-Fatah* military wing of PLO.  Suicide attempt while in custody.  Convicted March 4, 1994 in TRADEBOMB; 240 years."  Gregory Hershberger, who was the north central regional director, authorized Mr. Ajaj's transfer to ADX.

Mr. Ajaj has only one lung.  Since his arrival at ADX, he has had concerns about the effect of the prison's high altitude and presence of second-hand smoke upon his remaining lung. He believes that doctors have recommended his placement in a low altitude, smoke-free housing assignment to address his medical condition, and that the Federal Officers have failed to follow such recommendation.[8]  However, there is no evidence that doctors have diagnosed any problem with his lung function nor any medical condition/need that requires Mr. Ajaj's placement in smoke-free, low altitude housing.[9]

The transfer summary to which Mr. Ajaj refers was prepared on February 19, 1998, 4 ½ years prior to his transfer to ADX.  Upon referral of Mr. Ajaj for a mental health evaluation, a psychologist and a psychiatrist prepared the transfer summary.  It contains no evidence that these mental health professionals conducted any physical examination of Mr. Ajaj.  However, it

---

[8] Shortly after his arrival at ADX, Mr. Ajaj wrote to Mr. Hood and Mr. Duncan advising them of his belief that a low altitude, smoke-free housing assignment had been ordered by doctors at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri.  Approximately 6 months later, he advised Mr. Burrell of his belief that Dr. Lawrence Leyba, a medical doctor at ADX, had ordered his assignment to a tobacco free unit, but that this order had not been followed.

Apparently, Rod Bauer, the Health Systems Administrator at ADX, also assumed that Mr. Ajaj's medical condition was the basis of a recommendation that he be assigned to smoke-free housing.  Mr. Bauer authored an e-mail on June 24, 2004, to Mr. Chester, in which he referred to a medical recommendation for smoke-free housing. However, Mr. Ajaj's medical records speak for themselves.

[9] Indeed, Federal Officers contend that because no "700 medical transfer" was requested by a physician, Mr. Ajaj cannot prove that a smoke-free housing assignment was prescribed.  At this juncture, the Court construes the evidence most favorably to Mr. Ajaj and does not presume that the absence of a "700 medical transfer" is dispositive, however the absence of the transfer is consistent with the medical reports.

generally states that Mr. Ajaj "will experience limited exercise capacity at facilities more than 2,000 feet above sea level and should be considered for facilities with elevations lower than that."

Upon his transfer to ADX, and until July 2005, Mr. Ajaj was housed in a unit which allowed smoking.  In addition to being concerned about the high-altitude location of ADX, Mr. Ajaj became concerned about the effect of second-hand smoke upon his lung function.  He consulted with physician Dr. Lawrence Leyba on two occasions.  Medical records from both consultations show that Mr. Ajaj shared his concerns with Dr. Leyba, but Dr. Leyba was unable to make any objective observation or diagnosis of any health condition or need that required Mr. Ajaj to have a particular housing assignment.

The first consultation occurred on January 21, 2003.  Mr. Ajaj complained of chest pain, chronic fatigue and of smoke coming into his cell through the air vents.  Dr. Leyba observed that Mr. Ajaj's color was good and his right lung was clear.  Not discerning any medical problem, it appears that Dr. Leyba considered a change in housing as a possible diagnostic tool.  He wrote that "Pt has been recommended to unit team for housing in smoke free environment."  In addition, this medical record states that an assessment of Mr. Ajaj's environment, including the altitude of the prison, will be conducted.

On March 10, 2003, Mr. Ajaj again consulted with Dr. Leyba, complaining of pulmonary troubles in his lower extremities, but there is no apparent complaint about altitude or exposure to second-hand smoke.[10]  Medical records from that visit show that Dr. Leyba observed that Mr. Ajaj was in poor physicial condition and had nasal congestion, but that he was breathing normally, was not coughing or wheezing, and had good color.  Dr. Leyba encouraged Mr. Ajaj to exercise

---

[10] *See* discussion regarding installation of air filters, *infra*.

and get fresh air during outdoor recreation.  This report contains no diagnosis of any medical ailment, and makes no recommendations or orders with regard to Mr. Ajaj's housing assignment.

After the March 10, 2003 consultation, Dr. Leyba sent an e-mail to Mr. Burrell.  The e-mail described Mr. Ajaj's subjective complaints, noted that Mr. Ajaj "is in excellent health," and suggested that Mr. Ajaj be placed in a tobacco-free unit, if possible, while Dr. Leyba investigated his complaints and determined what tests should be conducted.

After the first consultation with Dr. Leyba, Mr. Ajaj's unit manager sent a memorandum to Mr. Burrell.  This memorandum repeats Dr. Leyba's inability to confirm Mr. Ajaj's subjective complaints.  The memorandum also states that on January 30, 2003, at Mr. Ajaj's request, an air filter was installed to filter dust and smoke odor from his cell.  It also states that Mr. Ajaj "indicated to the Facilities Manager that he felt the filter had helped him and he understood that most of the dust was probably coming from the inside of his cell, clothes, blankets, etc." Mr. Ajaj confirmed "that the filter was working well."

Notwithstanding the installation of the air filter, Mr. Ajaj contends that he could smell cigarette smoke in his cell and that smoke entered his cell through the ventilation system.  Other than his statement, there no evidence that Mr. Ajaj was exposed to second-hand smoke in his cell after installation of the filter.  Smoking by inmates at ADX was banned in July 2005, and as a consequence, Mr. Ajaj has not been exposed to second-hand smoke since then.

Like other ADX inmates in administrative detention, Mr. Ajaj is confined to his cell for 23 hours per day, has minimal contact with prison staff, and is allowed to spend only 5 hours per week outside of his cell for purposes of recreation.  During his first year at ADX, he was denied access to the outdoor recreation yard.  Since March 2005, Mr. Ajaj has been restricted to using

the recreation cage by himself.  Currently, there are times when outdoor recreation is cancelled.

Either by choice or otherwise, most of the time, Mr. Ajaj spends his allotted recreation time

indoors.

ADX has a stratified housing system which allows inmates to progress through a "step-

down" program from the most restrictive to the least restrictive housing assignment. Ordinarily,

inmates are first housed in the General Population Unit, then progress into the Intermediate/

Transitional Unit, and then progress into the Pre-Transfer Unit before they are transferred out of

ADX.  Ordinarily, inmates are automatically assessed every six months for purposes of

determining whether they should progress in this manner.  Progression through these levels takes

a minimum of 36 months, but can last longer.

Several factors are considered before an inmate can "step down," or progress, to a new

housing assignment.  The factors that have been identified are: (a) whether the inmate has actively

participated in and completed programs recommended by his unit team; (b) the inmate's overall

institutional adjustment, personal hygiene, and cell sanitation; (c) the inmate's interaction with

staff; and (d) whether the factors which led to placement in ADX have been successfully

mitigated.

Ordinarily, the unit team recommends whether an inmate should be stepped down.  This

recommendation is discussed with the associate warden, who then makes a recommendation to

the warden.  An inmate who is denied a step down is provided notice of the denial, a written

statement of reasons, and an additional review in six months.  The inmate may appeal a step down

denial using the Administrative Remedy Process.

Mr. Ajaj contends that he has repeatedly been denied step downs.  He specifically

9

contends that he has met all of the step down criteria based on a Progress Report dated January 25, 2005, that states he has "maintained clear conduct since November 2001."

Mr. Chester and Mr. Zuercher, as associate wardens, reviewed three unit team recommendations to deny a step down to Mr. Ajaj.  Mr. Ajaj received three written notices, all informing him that he would not be stepped down because "it is believed your reason for placement at the ADX has not been sufficiently mitigated."

The only evidence in the record that offers any explanation of this oblique statement is a "Male Custody Classification Form" dated July 15, 2005, which states: "Decrease will not be granted due to Ajaj's current sentence of damage to buildings by explosive, and conspiracy to damage bldgs by explosive device.  Also, due to his ties with those responsible for the initial bombing of the World Trade Center he will remain as max custody."  The signature on this document is illegible but appears next to the title "chairperson."

Mr. Ajaj believes that several similarly situated inmates have been treated more favorably than he has been treated.  He identifies Mr. Dover, Mr. Smith, Mr. Thomas and Mr. Jansen,[11] all of whom are African American, as examples of non-Arab, non-Palestinian inmates who were allowed to participate in the step down program.  However, there is no evidence that Mr. Dover, Mr. Smith, Mr. Thomas, or Mr. Jansen are similarily situated to Mr. Ajaj.  Specifically, there is no evidence in the record regarding these inmates' classifications, convictions or sentences to demonstrate their similarity to Mr. Ajaj.

### V.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment when

---

[11] He provides no first names for these individuals.

10

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion,

a court views all evidence in the light most favorable to the non-moving party, thereby favoring

the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(e).

Once the moving party has met its burden, to avoid summary judgment the responding party must

present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See*

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v.*

*Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material

fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.

The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

11

If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## VI. Analysis

The Federal Officers claim entitlement to qualified immunity on Claims 2 (Eighth Amendment Violation), 3(A) (Eighth Amendment Violation), 3(B) (Procedural Due Process Violation) and 5 (Equal Protection Violation).  Qualified immunity is a protection from trial and other burdens of litigation.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005).  When facing a claim for civil damages under *Bivens*, a federal officer is entitled to qualified immunity if the officer's conduct did not violate a clearly established statutory or constitutional right of which a reasonable officer would have known.  *See Wilson v. Layne,* 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1247 (10th Cir. 2003).  The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *See Roska*, 328 F.3d at 1251 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In response to the Federal Officers' claim of qualified immunity, Mr. Ajaj bears the heavy burden of demonstrating that: (1) the Federal Officers violated a constitutional or statutory right; and (2) the right was clearly established at the time of their unlawful conduct.  *See Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).  Under this two-pronged test, the Court first determines whether a constitutional right was violated. This inquiry requires the Court to evaluate

12

all evidence in the light most favorable to Mr. Ajaj. *See Saucier v. Katz*, 533 U.S. 194, 201

(2001). If there is sufficient competent evidence to support the first prong, then the Court

determines whether the constitutional right was clearly established. *See Saucier,* 533 U.S. at 201.

This inquiry is made in light of the specific context of the case, not as a broad general proposition.

*See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*). However, the particular

officer's subjective understanding of the law is not pertinent to this analysis. Whether the law was

clearly established is essentially a legal question and is measured by an objective standard. *See*

*Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998). Although Mr. Ajaj is not required to

identify a factually identical case to demonstrate that the constitutional right was clearly

established, he should identify a Supreme Court or Tenth Circuit opinion on point, or demonstrate

that the right is supported by the weight of authority from other courts. *See Robbins v. Wilkie*,

433 F.3d 755, 764 (10th Cir.), *cert. granted,* 127 S. Ct. 722 (2006).

## A. Claim 2: Eighth Amendment Claim

In Claim 2, Mr. Ajaj alleges that Mr. Hood, Mr. Burrell and Mr. Duncan failed to protect

him from an unreasonable risk of harm by failing to move him to a low altitude, smoke-free

housing assignment, contrary to prescribed medical treatment. This Eighth Amendment claim

actually consists of two alleged violations: (1) that Mr. Hood, Mr. Burrell and Mr. Duncan failed

to act in accordance with prescribed medical treatment; and (2) that Mr. Hood, Mr. Burrell and

Mr. Duncan exposed Mr. Ajaj to an unreasonable risk of harm by failing to move him to a low

altitude, smoke-free environment.

Mr. Hood, Mr. Burrell and Mr. Duncan contend that they are entitled to qualified

immunity because Mr. Ajaj cannot prove an Eighth Amendment violation.[12]  Analysis of the

alleged Eighth Amendment violations requires assessment of objective and subjective

components.  These are: (1) that Mr. Ajaj's conditions of confinement are sufficiently serious so

as to deprive him of the minimal civilized measure of life's necessities, or to constitute a

substantial risk of serious harm (the objective component); and (2) that each Defendant had a

culpable state of mind, *i.e.*, he acted, or failed to act, with deliberate indifference to Mr. Ajaj's

health and safety (the subjective component).  *See Shannon v. Graves,* 257 F.3d 1164, 1168 (10th

Cir. 2001).

When there is an alleged deprivation of medical treatment, the objective component is

satisfied upon a showing that the inmate's pain, or the deprivation of treatment, was sufficiently

serious.  *See Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993).  A medical need is serious if

it has been diagnosed by a physician as requiring treatment, or it is so obvious that even a lay

person would recognize the necessity for treatment.  *See Riddle v. Mondragon*, 83 F.3d 1197,

---

[12] The Court previously addressed this issue in the context of the Federal Officers' motion to
dismiss under Fed. R. Civ. P. 12(b)(6).  At that juncture, Mr. Ajaj had alleged sufficient facts to
demonstrate the violation of his Eighth Amendment rights.  The Court also stated:

> Since at least 1993, courts have recognised that exposing an inmate to
> unreasonably high levels of second-hand smoke can violate the Eighth
> Amendment.  *See Helling v. McKinney*, 509 U.S. 25, 35 (1993).  It is also
> long established that delaying an inmate's prescribed medical treatment
> can violate the Eighth Amendment.  *See Hunt v. Uphoff*, 199 F.3d 1220,
> 1224 (10th Cir. 1999).  Construing the alleged facts most favorably to
> Mr. Ajaj, any amount of second-hand smoke was unreasonably high given
> the doctor's recommendation, and the failure to move him to a smoke-free,
> low altitude environment constituted a delay in the doctor's prescribed
> course of treatment.

As a consequence, the Court concluded that Mr. Ajaj demonstrated an Eighth Amendment violation on the
face of his pleadings.  Now the Court considers whether Mr. Ajaj has offered sufficient competent evidence
to demonstrate a triable Eighth Amendment claim.  The Court no longer defers to Mr. Ajaj's allegations
and instead looks at the evidence he has produced to assess its sufficiency.

1202 (10th Cir. 1996).[13]

Construing the evidence most favorably to Mr. Ajaj, the Court finds that he has failed to produce sufficient competent evidence to support the objective prong of this claim. With regard to his contention that Mr. Hood, Mr. Burrell and Mr. Duncan failed to provide prescribed medical treatment, he has produced no evidence that he had a diagnosed medical need or condition that required a low altitude or smoke-free housing assignment. Dr. Leyba never diagnosed Mr. Ajaj with a medical condition which required a particular housing assignment. To the contrary, Dr. Leyba was unable to reach a diagnosis based upon Mr. Ajaj's subjective complaints and concluded that additional testing might be beneficial. He suggested that Mr. Ajaj be housed in a smoke-free assignment, if possible, while a diagnosis could be determined.

The only document in the record which refers to a low altitude housing assignment is the February 19, 1998 transfer summary. It contains no diagnosis of a medical need or condition and orders no particular housing assignment; it simply suggests consideration of a low altitude assignment in order to provide Mr. Ajaj with greater exercise capacity. Furthermore, there is no evidence that either person who prepared the transfer summary was competent to diagnose a medical need requiring a specific housing assignment.

With regard to Mr. Ajaj's contention that he was exposed to an unreasonable risk of harm because Mr. Hood, Mr. Burrell and Mr. Duncan did not move him to low altitude, smoke-free

---

[13] For purposes of this opinion, the Court does not reach the subjective component. However, to establish the subjective component, a prisoner must show more than a negligent failure to provide medical treatment. *See Handy*, 996 F.2d at 1067. Instead, the prisoner must demonstrate an unnecessary and wanton infliction of pain, in particular, that the official knew about and disregarded an excessive risk of harm to the inmate's health. *See Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

15

housing, the Court finds that he has also failed to produce sufficient competent evidence.  First, there is no evidence of any risk associated with the altitude of ADX, except the transfer summary referred to above.  Second, although Mr. Ajaj cites to studies and case law with regard to the effect of second-hand smoke, he has not submitted sufficient evidence to establish that he was exposed to second-hand smoke for any significant period of time.  In February 2003, at his request, air filters were installed in his cell.  The record is devoid of any objective evidence that he was exposed to second-hand smoke thereafter.  Third, assuming that second-hand smoke was present, there is no evidence of the quantity of the smoke to which Mr. Ajaj was exposed, or that such amount of smoke was objectively unreasonable or dangerous.  Quite to the contrary, Dr. Leyba never observed Mr. Ajaj to suffer any adverse physical effect as a result of second-hand smoke.

Because he has failed to produce sufficient competent evidence in support of the objective prong of this Eighth Amendment claim, Mr. Hood, Mr. Burrell and Mr. Duncan are entitled to qualified immunity.

## B.  Claim 3: Eighth Amendment and Due Process Claims

### Claim 3(A) – Eighth Amendment Claim

In Claim 3(A), Mr. Ajaj alleges that Mr. Hood, Mr. Burrell, Mr. Chester and Mr. Duncan were deliberately indifferent to the conditions of his confinement in violation of the Eighth Amendment, in specific: (1) limitations on his property rights, mail, access to telephones and recreation; (2) lock-down for 23 to 24 hours per day, in extreme isolation; (3) imposition of discipline for minor offenses; (4) noise; (5) lights which remain on in his cell 24 hours per day; and (6) the indefinite nature of his confinement at ADX.  Mr. Hood, Mr. Burrell, Mr. Chester and Mr.

16

Duncan contend that Mr. Ajaj can establish no Eighth Amendment violation premised upon these conditions.

As discussed *supra*, to establish a *prima facie* Eighth Amendment violation, Mr. Ajaj must produce sufficient, competent evidence that: (1) his conditions of confinement are sufficiently serious so as to deprive him of the minimal civilized measure of life's necessities, or to constitute a substantial risk of serious harm (the objective component); and (2) each Defendant had a culpable state of mind, *i.e.*, he acted, or failed to act, with deliberate indifference to Mr. Ajaj's health and safety (the subjective component).   *See Shannon,* 257 F.3d at 1168.

In his Third Amended Complaint, Mr. Ajaj complains of several specific conditions of confinement.  In his response to the Federal Officers' motion, he points to evidence of only two – his limited ability to exercise outdoors at ADX, and his anticipated, indefinite confinement at ADX without an opportunity to step down.  This evidence, standing alone, does not support the objective prong of an Eighth Amendment claim.  *See Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (no Eighth Amendment violation by placing an inmate in segregation as a preventive measure, or when inmate allowed to use an outdoor recreation cage for 1 hour per week).  Therefore Mr. Hood, Mr. Burrell, Mr. Chester and Mr. Duncan are entitled to qualified immunity.

### Claim 3(B) – Procedural Due Process Claim

In Claim 3(B), Mr. Ajaj alleges that Mr. Hood violated his right to procedural due process[14] because he was transfered to ADX without notice or a hearing, and because he

---

[14] The Court notes that this claim is limited to procedural due process, as specifically asserted by Mr. Ajaj's counsel.

continues to be confined there without a meaningful right to step down.  Mr. Ajaj contends that

the conditions of confinement at ADX are significant and atypical, and that his placement there

implicates a liberty interest.  Mr. Hood contends that Mr. Ajaj can establish no procedural due

process violation with regard to his placement at ADX and continued confinement there, or that

the law was clearly established at the time of the alleged violations.

To establish a *prima facie* procedural due process violation, Mr. Ajaj must produce

sufficient competent evidence that shows both (1) the deprivation of a liberty or property interest,

and (2) the absence of adequate process.  *See Boutwell v. Keating*, 399 F.3d 1203, 1211-12 (10th

Cir. 2005); *Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003).  Here, Mr. Ajaj challenges his

initial transfer to ADX without prior notice or a hearing, as well as his continued detention at

ADX without a meaningful right to step down.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court addressed what process

must be afforded to inmates before and after indefinite placement in an Ohio maximum security

prison ("OSP"), where inmates are subjected to extreme isolation, are unable to converse with

other inmates, have almost no human contact, and remain in their cells 23 hours per day.  The

Supreme Court concluded that inmates have a protected liberty interest in avoiding assignment to

that particular prison because of its particularly harsh conditions.  It then held that the following

procedures were sufficient to satisfy the Constitution: (1) prior to placement, the inmate was

given notice of the factual basis for the placement and an opportunity to rebut it; and (2) if the

decision was to place the inmate in OSP, the decisionmaker would provide a short statement of

reasons; and  (3) there was a placement review within 30 days after placement at OSP.  At any

level of the review process, there was power to overturn the OSP placement.

Construing the evidence most favorably to Mr. Ajaj, he has not produced sufficient competent evidence to support a procedural due process violation with regard to his initial transfer to ADX.  First, it was not Mr. Hood who decided to place him at ADX.  Moreover, Mr. Ajaj had been housed in administrative detention before he was transferred to ADX, and there is no evidence in this record to suggest that he was deprived of more liberty at ADX than he had been at FCI Edgefield.  Therefore, as to the initial transfer to ADX, there has been no demonstration of a due process violation.

However, Mr. Ajaj has produced sufficient competent evidence to support a procedural due process violation with regard to his continued detention at ADX without a meaningful right to step down.  Indefinite administrative detention at ADX, under the conditions described by Mr. Ajaj, would result in the deprivation of a liberty interest.  Thus, the question becomes, what process is due?

The Court discerns from *Wilkinson* at least three due process requirements: (1) notice of the reasons for placement in administrative detention; (2) a meaningful opportunity to be heard in opposition; and (3) periodic reviews.  In this case, Mr. Ajaj has been denied a step down on three occasions.  With regard to each, he was provided written notice that stated "it is believed your reason for placement at the ADX has not been sufficiently mitigated."  These notices did not identify what the original "reason for placement" was, nor has Mr. Ajaj ever been provided with such a reason, when he was placed in administrative detention at FCI Edgefield, in conjunction with his transfer to ADX, or with regard to his placement in administrative detention at ADX.  As a consequence, the reference in the notices he has received to the "reason for placement" is meaningless.  It gives him notice of nothing and therefore deprives him of any meaningful

19

opportunity either to object to, or to appeal from, the denial of a step down.[15]

The Court therefore turns to the second aspect of the qualified immunity analysis –
whether Mr. Ajaj has demonstrated that the law was clearly established at the time of the alleged
constitutional violation.  In this regard, Mr. Ajaj has not met his burden of production.  The
Supreme Court's decision in *Wilkinson* was not issued until 2005; it is instructive as to the
amount of process due to an inmate, but it was limited to the Ohio prison, OSP, and has been
distinguished by one unpublished Tenth Circuit case with facts quite different from those
presented in the case at bar.  *See Jordan v. Federal Bureau of Prisons*, 2006 WL 2135513 (10th
Cir. Jul. 25, 2006) (not selected for publication in the Federal Reporter).[16]  In *Jordan*, the Tenth
Circuit determined that *Wilkinson* was not dispositive because the conditions of the plaintiff's
confinement at ADX were not as onerous; he had frequent contact with staff, administrative
detention did not affect the length of his sentence, and his confinement at ADX was not indefinite.
In contrast, Mr. Ajaj's evidence suggests that he is completely isolated from others and that his
confinement at ADX is indefinite.  Mr. Ajaj has identified no caselaw directly on point which
demonstrates that Mr. Hood's conduct was a clear violation of the law at any time.  Therefore,
Mr. Hood is entitled to qualified immunity on Claim 3(B).  However, Mr. Ajaj retains his official
capacity claim against Mr. Wiley and Mr. Nalley, which by operation of law is a claim against

---

[15]  Mr. Ajaj has been left to speculate as to the reasons for his placement in administrative
detention, transfer to ADX and inability to step down.  He surmises that this is because he is a Palestinian,
or because of his prior conviction.  If either is the case, this Court is left with concerns that his liberty
interest has been compromised and will continue to be compromised, indefinitely, based upon
circumstances he can neither change nor mitigate.

[16]  A copy of this opinion was filed by the Federal Officers (**#229-19**) and therefore is not attached
to this Order.

ADX.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991), *citing Kentucky v. Graham,* 473 U.S. 159,

165 (1985).   The Court deems this also to be an official capacity claim against Mr. Hood.

## C.  Claim 5: Equal Protection Claim

In Claim 5, Mr. Ajaj alleges that Mr. Hood, Mr. Chester and Mr. Zuercher violated his

right to equal protection, in that he has been singled out for different and harsher treatment

because he is a Palestinian Muslim and not allowed to participate in the "step-down" program.

Mr. Hood, Mr. Chester and Mr. Zuercher contend that Mr. Ajaj cannot establish a violation of his

right to equal protection.[17]

To establish a *prima facie* equal protection claim, Mr. Ajaj must produce sufficient

competent evidence that each Defendant treated him differently than other, similarly situated

inmates.  *See Fogle v. Pierson*, 435 F.3d 1252, 1260-61 (10th Cir. 2006), *petition for cert. filed*,

(Apr 04, 2006) (No. 06-6669).   He has produced evidence that he has not been allowed to step

down to an intermediate unit, but his evidence is insufficient to demonstrate that other inmates

who were permitted to step down were similarly situated to him.   Although he has provided the

names of a few inmates whom he believes were neither Palestinian nor Muslim and were allowed

to step down, has has not provided evidence of their convictions, sentences or other records

which would demonstrate that they are similarly situated to him.   Therefore, he has failed to

demonstrate that Mr. Hood, Mr. Chester or Mr. Zuercher violated his right to equal protection.

Therefore, these Defendants are entitled to qualified immunity on Claim 5.

## VII.  Conclusion

Mr. Hood, Mr. Burrell, Mr. Duncan, Mr. Chester, and Mr. Zuercher are entitled to

---

[17] They do not contend that the law was not clearly established at the time of the alleged violation.

qualified immunity on Claims 2, 3(A), 3(B) and 5.  As to Claims 2, 3(A) and (5), qualified

immunity has been granted because Mr. Ajaj has not presented evidence sufficient to establish a

constitutional violation.  Therefore, these three claims are dismissed, in their entirety.  Claim 1 is

dismissed as well, because it is premised upon the same facts as Claim 2.  Claim 1 alleges that the

Defendants failed to supply prescribed medical treatment in the form of a low altitude, smoke-free

housing assignment, but Mr. Ajaj has not made a sufficient showing that that was ever prescribed.


The only claim remaining is Claim 3(B), denial of procedural due process with regard to

ADX step downs, brought against Mr. Hood, Mr. Wiley and Mr. Nalley in their official capacities.

On October 5, 2006, the parties filed a Proposed Final Pretrial Order **(#254)** which

outlines the claims and defenses asserted.  The Final Pretrial Order is intended to be a roadmap

for trial and should not include any claims or defenses for which there has been a dispositive

ruling.[18]  In light of the present ruling, the information to be set forth in the Final Pretrial Order is

substantially limited.  Therefore, the Court declines to issue the Proposed Final Pretrial Order

tendered by the parties.

**IT IS THEREFORE ORDERED** that:

(1)     The Federal Officers' Motion for Summary Judgment **(#229)** is **GRANTED**.

(2)     The Federal Officers are entitled to qualified immunity on Claims 2, 3(A), 3(B) and

5.

(3)     Claims 1, 2, 3(A) and 5 are dismissed.  The sole claim remaining for trial is Claim

---

[18] Inclusion of previously rejected defenses in the Final Pretrial Order is not necessary to preserve issues for appeal.

3(B) (denial of procedural due process with regard to ADX step downs) against

Defendants Hood, Wiley and Nalley in their official capacities.  The caption shall

be amended on all future pleading to delete all Defendants other than these.

(4)    The parties shall submit a revised proposed final pretrial order to the Court by

January 19, 2007.

Dated this 22nd day of December, 2006

**BY THE COURT:**

_Marcia S. Krieger_
_____
Marcia S. Krieger
United States District Judge